**Dated: October 3, 2018**

**The following is ORDERED:**



_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:

JUSTIN D. DAVENPORT,                      Case No. 17-80559-TRC

        Debtor.                                     Chapter 7

FIRST BANK & TRUST, CO.,

        Plaintiff,

vs.                                            Adv. Case No. 17-8016-TRC

JUSTIN D. DAVENPORT,

        Defendant.

## MEMORANDUM OPINION

Plaintiff First Bank & Trust, Co. ("First Bank") seeks a determination that Defendant Justin D. Davenport should be denied a discharge of his debts pursuant to 11 U.S.C. § 727(a) (3) and (5). At the trial of this matter, First Bank was represented by Mike Mordy and Carrie

Pfrehm.  Defendant Davenport appeared *pro se*.  After careful review of the testimony and exhibits admitted, as well as the relevant legal arguments and authority, the Court finds that First Bank met its burden of proof by a preponderance of the evidence.  Justin D. Davenport failed to provide adequate financial documentation and failed to offer a satisfactory explanation regarding the loss of First Bank's collateral.  Therefore, the Court finds that Mr. Davenport's discharge should be denied.

## **I.** **Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## **II.** **Findings of Fact**

Justin D. Davenport ("Davenport") is a resident of Ardmore, Oklahoma.  Davenport operated a business known as J D Davenport Company which provided environmental services in the oilfield industry.  He and First Bank characterized his business as successful and "good-sized."  Davenport maintained a checking account at First Bank under his name d/b/a J D Davenport Company.  He acknowledged that he typically maintained a balance of approximately $100,000 in this business account.

Davenport was the sole custodian of his company's business records.  He officed out of his home and kept his business records there until he was divorced.  After his divorce, he had no room in his new residence to store his business records, so the records were placed into a storage unit shared with his ex-wife.  When his ex-wife failed to pay the rental fees on the storage unit, the records were lost.  At trial, Davenport testified that the only financial records he had were the bank records provided to him by First Bank.  He also told the Court that while he did have other records in his possession, he did not wish to offer any into evidence.

Davenport and First Bank's business relationship dated back to 2008. At the time he filed bankruptcy, Davenport had four promissory notes and commercial security agreements with First Bank with amounts due and owing. These agreements were secured by various items of equipment owned by Davenport. The collateral consisted of personal property with values substantially greater than the notes they secured. Davenport agreed that financing statements and liens on this collateral were properly recorded. Photographs of the collateral indicate that the items were large bulldozer-type machinery with enclosed cabs. Large, custom-made trailers were used for hauling this equipment.

The first note and security agreement was Loan No. 3004, dated August 28, 2012, for $90,110. Davenport pledged a 2010 JCB Trac Hoe, Serial No. JCBJS28BE7104, as collateral for this loan. He estimated that the Trac Hoe was worth approximately $150,000 when he pledged it, and testified that he owned this Trac Hoe at the time he pledged it to First Bank. At the time he filed bankruptcy, he agreed that he still owed $96,194.87 on this note, but he no longer had possession of this 2010 Trac Hoe.

The second note and security agreement, Loan No. 3473, was executed on March 27, 2014, for $57,075.68. Davenport pledged three pieces of equipment as collateral for this loan: a 2008 Cargo Mate trailer valued at $24,533, a 2010 P Hitch Trailer valued at $2800, and a 2005 Case Track Loader valued at approximately $12,500. At the time he filed bankruptcy, Davenport agreed that he still owed $50,654.81 on this note, but no longer had possession of the collateral. The Cargo Mate trailer was repossessed by First Bank. The P Hitch Trailer was stolen but Davenport was unable to collect on insurance for this collateral. The Case Track Loader was sold and its proceeds paid to First Bank to reduce his note.

The third note and security agreement, Loan No. 3615, was executed October 20, 2014, for $29,235. Davenport pledged a 2013 Case Skid Steer as collateral, which he valued at $55,000 to $60,000. At the time he filed bankruptcy, Davenport agreed that he owed $28,315.84 on this note, and no longer had possession of the collateral. The Case Skid Steer was reported as stolen. Again, Davenport was unable to collect on insurance for this equipment.

The fourth and last note and security agreement, Loan No. 3677, was executed March 11, 2015, for $100,175. This loan was secured by a 2011 John Deere 750J bulldozer valued at approximately $105,000. At the time he filed bankruptcy, Davenport agreed that he owed $118,441.94 on this note.

Davenport defaulted on these notes and First Bank filed a replevin action in Carter County, Oklahoma, Case No. CJ-2017-40. The state court issued a Temporary Restraining Order directing Davenport not to dispose of four items of property pledged as collateral: a John Deer (*sic*) 75OJ, a 2013 Case Skid Steer, a 2010 P Hitch Trailer and a 2010 JCB Trac Hoe.

Davenport filed bankruptcy on May 24, 2017. On Schedule D, he listed collateral securing his debt to First Bank valued at $208,626.94, as follows: Loan No. 3004 - 2009 JCB Model JS 260 valued at $85,711.14, and John Deer 75OJ bulldozer "sold" valued at $0; Loan No. 3615 - Case Skid Steere "stolen from job site" valued at $0, and Skid Steer TR270 and equipment "stolen" valued at $22,933; and Loan No. 3677 - "line of credit" and Komatsu Dozer, valued at $0, and 2011 John Deere 750J valued at $99,892.90. Davenport listed the remainder of First Bank's debt as unsecured.

In Part 6 of his Statement of Financial Affairs, losses due to theft, fire, other disaster, or gambling, Davenport included two entries. The first listing was for a 2012 John Deere Back Hoe and a 2013 Case Skid Steer valued at $140,000, date of loss July 21, 2015, not paid by insurance

but "in litigation." The second entry was for a Case Skid Steer, 2014 valued at $60,000, identifying Fidelity Mutual as the insurer for this item. He did not list the date of loss of the Case Skid Steer, 2014, nor did he indicate whether he had recovered on a claim on the insurance for this item. Davenport did not identify any pending insurance claims or lawsuits on Schedule A/B, No. 33 Claims against third parties. He listed his income for 2014 as $80,000 and for 2015 as $60,000. He reported $0 income for 2016 prior to filing.

After filing bankruptcy, Davenport prepared tax returns for 2015, 2016 and 2017. The Court was not provided information regarding the filing date, if any, of these returns. His tax preparer signed his 2015 and 2016 tax returns on September 11, 2017, and signed his 2017 returns on July 2, 2018.[1] His 2015 Federal Tax Return identifies his occupation as "residential building construction." He identified himself as "self-employed" in his 2016 Oklahoma Tax Return, and as a "consultant" in his 2017 Oklahoma Tax Return. He reported a loss of $185,750 on his 2015 Federal Return due to the theft of a back hoe purchased January 15, 2014. He carried over this loss into 2016 and 2017.

At trial, First Bank focused on three items of collateral that remained unaccounted for by Davenport upon filing his bankruptcy: a 2011 John Deere 750OJ bulldozer, a 2013 Case Skid Steer TR270, and a 2010 JCB Trac Hoe.

**2011 John Deere 750J bulldozer**

Davenport told the Court that he sold this bulldozer for $110,000 but he could not recall the name of the buyer, nor did he indicate when the sale occurred. According to Davenport, records regarding this sale were lost due to his ex-wife's failure to pay rental fees on the storage unit where such records were housed. Davenport said that proceeds from this sale were

---

[1] Davenport's signature does not appear on the tax returns submitted at trial.

deposited into his JB Davenport account with First Bank, with an unknown portion being applied to his First Bank debt. Davenport speculated that he used the remaining proceeds to buy more equipment. He said this sale was made with the permission of his loan officer at First Bank. According to Davenport, First Bank was supposed to release its lien on this bulldozer and substitute a Caterpillar machine as collateral on Loan No. 3677 but failed to do so. When Davenport learned that the lien on the John Deere had not been released, he spoke with Glen Jones, who he identified as the president of First Bank. Davenport stated that Jones agreed to substitute the Caterpillar machine for the John Deere bulldozer but the paperwork to do so was never completed. Davenport offered to allow First Bank to place a lien on the Caterpillar, but First Bank never did so.

Summer Byrd, asset recovery supervisor for First Bank, testified regarding the bank's efforts to recover its collateral for Davenport's loans. Once it obtained the replevin order from the state court, First Bank used repossession agents from the surrounding area, Barton Recovery in Marlow, as well as national agents recommended by its insurance company to locate and recover its collateral. First Bank's records indicated that Davenport still owned this collateral, so representatives attempted to talk to him about the location of this item but were unable to do so. Repossession agents were unable to locate the John Deere bulldozer, nor did they find a Caterpillar machine that Davenport offered to substitute as collateral. These agents searched in Florida and Oklahoma for collateral.

These were not the only efforts First Bank made to find its collateral. It also contacted the local sheriff to explore whether any of Davenport's equipment had been reported as stolen, but there were no reports made nor items recovered. The sheriff may have received a report of stolen items but that report was made prior to the origination of Davenport's loans and did not

identify what items were stolen. Byrd testified that the Bank's loan file did not include any notes from the loan officer Trey Ratliff nor from Glen Jones approving a sale of this item. No sale proceeds from this 2011 John Deere bulldozer were ever deposited into Davenport's account or applied to this loan.

Davenport disputed Byrd's information. He stated that a repossession company named Spider Investigations in Dallas/Ft. Worth, was hired by First Bank and repossessed a Caterpillar bulldozer twenty-two months ago. Davenport stated that the bulldozer did not have a lien on it and he thought it had been swapped as collateral to replace the 2011 John Deere bulldozer. He told Glen Jones that First Bank could either put a lien on the repossessed bulldozer in Florida and sell it there, or go get the bulldozer and pay $8000 to $12,000 in fees to haul the bulldozer back to Oklahoma. He said that he has no idea what happened to this bulldozer after Spider Investigations repossessed it. Byrd stated that she had never heard of Spider Investigations.

**2013 Case Skid Steer**

Davenport leased this machine and other items to Brian Tarter, who had possession of them at his home in Overbrook, Love County, Oklahoma. The equipment was stolen, along with the custom-built P Hitch Trailer with attachments and a John Deere backhoe from Tarter's home. Davenport estimated that the Case Skid Steer was worth $60,000 to $70,000 when he pledged it to First Bank and $50,000 at the time it was stolen. Davenport testified that he filed a report with the Love County Sheriff reporting this theft. He did not present a copy of this report as evidence but stated that his only copy had been provided to First Bank. Davenport suggested that he could call the Sheriff and have the report faxed to the Court.

Davenport testified that he carried insurance on this Case Skid Steer, and he told the Court he filed a claim on this insurance. However, the insurance company refused to pay on this

claim because of an erroneous VIN number. He had no written evidence that a claim was made and denied. He said that he lacked corroborating evidence regarding the insurance claim because the claim was actually made by Tarter who took the insurance on the lease. Tarter received the written denial of the claim from his insurance company, and that document was in the possession of Tarter's attorneys. Davenport has no proof that a claim was made and denied because it wasn't his claim to file. He stated that he has no idea where these items are. His family employed eight county sheriffs who looked for the stolen equipment but they were unable to find these items. Davenport has searched for the last three and a half months but has not located this collateral. He stated that the same weekend these items were stolen, another theft was reported.

**2010 JCB Trac Hoe S/N: JCBJS28BE7104**

Davenport testified that his purchase of this 2010 Trac Hoe was originally financed by John Deere. He obtained Loan 3004 in August of 2012 from First Bank, pledging this 2010 Trac Hoe as collateral, so that he could pay off his note with John Deere. He said that First Bank did indeed pay off his note with John Deere. He also stated numerous times that he sold this 2010 Trac Hoe in June of 2012, which was before he executed Loan 3004 on August 28, 2012 and pledged it as collateral. Davenport said that he sold the 2010 Trac Hoe to TP Environmental in June of 2012 for $115,000, and payment was wired to First Bank via a third party, Brian McGahey, who brokered the sale. Davenport did not have a sales receipt for the 2010 Trac Hoe, but he said that McGahey had evidence of the sale. According to Davenport, McGahey's companies, Iron Market and Equipment Experts, Inc., valued the 2010 Trac Hoe on the Iron Market website and brokered the sale to TP Environmental, for $115,000.[2] In support of this

---

[2] Davenport testified at his Deposition on May 17, 2018, that McGahey prepared the sales receipt for the 2010 Trac Hoe. McGahey's email of July 18, 2018 disputes Davenport's testimony.

testimony, Davenport referenced a video uplink from McGahey which he said was the sales receipt for the 2010 Trac Hoe sold in June of 2012. However, the exhibit containing screenshots of the video uplink was for a 2009 Trac Hoe, not a 2010 Trac Hoe, with different VIN numbers. McGahey did not testify, but an email from him to First Bank's counsel and Davenport was admitted into evidence. In this email, McGahey stated that he had no record of receiving money or services for selling or representing machinery on Davenport's behalf during the relevant time period. McGahey collected information at Davenport's request and included a link to that information regarding a 2009 Trac Hoe owned by Davenport. Davenport advised the Court that McGahey was confused about the equipment that was sold, that McGahey did indeed broker the sale of the 2010 Trac Hoe, but mistakenly included the link to a 2009 Trac Hoe rather than the 2010 Trac Hoe.

First Bank was supposed to apply the $115,000 sales proceeds against the loan secured by the 2010 Trac Hoe and release its lien on the Trac Hoe. Instead, the $115,000 was deposited into his JD Davenport account and the lien was not released. Davenport stated that this was First Bank's mistake, not his, and that no one knew that the funds had been wired and deposited into his checking account. Davenport claimed that the wire instructions stated the funds were to be applied to his loan secured by the 2010 Trac Hoe but that there was a different serial number. Davenport's bank statement for June 2012 does reflect a deposit by wire transfer from TP Environmental & Pipeline of $115,000 on June 20, 2012. Davenport did not know what happened to the $115,000 deposited into his bank account. Davenport discovered the mistake when he went to First Bank and asked for another loan to pay off another piece of equipment financed by John Deere Credit. First Bank refused to make that loan because it still had not been paid for the 2010 Trac Hoe. Davenport stated that the 2010 Trac Hoe note was paid off on

August 27, 2012 when First Bank withdrew funds from his account. No bank records were offered that verified this information. The loan history for Loan 3004 with the 2010 Trac Hoe as collateral reflects that funds were advanced on August 28, 2012.

Davenport also told the Court that the 2010 JCB Trac Hoe was sold on the 27th and First Bank drew a note on the 28th of August 2012 secured by the 2010 Trac Hoe for another Trac Hoe he purchased. Davenport said that the Trac Hoe was sold but not paid off so First Bank executed a new note until the Trac Hoe could be paid off. Davenport insisted that this note was "collected for" and that First Bank withdrew funds from his account to pay off the note secured by the 2010 JCB Trac Hoe. He never received any information from First Bank that this note was not paid off until three and half years later when First Bank withdrew $15,000 from his account. He also asserted that checks were missing from his bank records.

Davenport stated that he is being treated for nerve damage and a fractured hip due to years of driving race cars, but that he is not disabled. Of all the collateral pledged, First Bank recovered only one item, a 2008 Cargo Mate Trailer. Davenport promised to continue looking for his property and pursue recovery of insurance. He plans to file two lawsuits against insurance companies to recover for the stolen equipment.

### III. Conclusions of Law

#### A. Standard for Nondischargeability.

Debtors seek bankruptcy protection for a variety of reasons, but primarily they do so to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting

debt.'"[3] This is why denial of a debtor's discharge is an extreme step. The protections of the Bankruptcy Code are to be construed liberally in favor of the debtor and strictly against the creditor.[4] The party objecting to discharge has the burden of proving by a preponderance of the evidence that grounds exist supporting the denial.[5] First Bank seeks to deny Davenport's discharge on two grounds: § 727(a)(3) for failure to keep and preserve adequate records regarding debtor's financial condition or business transactions, and § 727(a)(5) for failure to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities. The Court will address each separately.

### B.    § 727(a)(3): failure to keep and preserve adequate records.

To establish a prima facie case under this section First Bank must show that Davenport "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his [or her] financial condition and *material* business transactions."[6] If First Bank meets this initial burden, it shifts to Davenport to justify his failure to maintain records. The scope of a debtor's duty to maintain adequate records depends on the nature of his business and the facts and circumstances of each case.[7] Records need not be so complete as to detail all or

---

[3]*Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934).

[4]*See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997); *Bank One v. Kallstrom (In re Kallstrom*), 298 B.R. 753 (10th Cir. BAP 2003).

[5]Fed. R. Bankr. P. 4005; *Mathai v. Warren (In re Warren)*, 512 F.3d 1241 (10th Cir. 2008); *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156 (10th Cir. 1991).

[6]*The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001)(quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997)(emphasis in original)), *aff'd*, 35 Fed. Appx. 811 (10th Cir. 2002).

[7]*Martinez v. Sears (In re Sears)*, 565 B.R. 184 (10th Cir. BAP 2017).

substantially all transactions that took place. They need only be sufficient to allow an intelligent inquiry.[8] Unlike other exceptions to discharge, no proof of a debtor's intent to defraud or conceal is required.

Davenport provided no financial records to the Court. He told this Court that the only financial records he had were the bank records provided to him by First Bank. He stated that he alone was the keeper of any records of his business. However, he did state that he had records at some point in time that were kept in storage. He officed out of his home until he was divorced, at which time he apparently had no room to keep his business records with him, so these records were placed into a storage unit shared with his ex-wife. When his ex-wife failed to pay the rental fees on the storage unit, the records were lost.

The Court finds that First Bank set forth a prima facie case reflecting Davenport's failure to maintain adequate financial documentation and business records. With no financial records, it was impossible to determine his financial condition and material business transactions. Davenport failed to provide a justification for his failure to provide records. He simply blamed his ex-wife. The Court believes that Davenport may not be a sophisticated businessman and would not expect him to keep or preserve detailed records of his business transactions. But, the Court expects that he would have some records supporting his business operations and some records to support his explanation of what happened to the valuable equipment he pledged as collateral to First Bank. He offered no records to allow any inquiry into his business transactions, let alone an intelligent one.

Davenport lacks credibility, offering inconsistent stories about the history of his loans, payments made, and disposition of First Bank's collateral. He blamed his ex-wife for his lack of

---

[8]*Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711 (Bankr. D. Colo. 2013).

records, although he stated that he shared the storage unit with her. He stated that he did have some business records, but inexplicably failed to produce them or bring them to the trial. If proof that he filed a report regarding stolen items could easily be obtained by calling the Love County Sheriff's office, he should have done so. Apparently he had some records which he used to prepare his bankruptcy schedules and tax returns. However, he told this Court that he had nothing to present. When asked whether he had any evidence that an insurance claim was made for the stolen equipment, he gave several reasons why he did not have that information: attorneys for Tarter refused to provide it to him, he didn't file the claim, Tarter made the claim. Thus, his explanations could not be verified.

At another point during his testimony, he stated that he did have business records regarding his lease arrangement with Tarter and that he could have provided them if asked to do so. The Court asked him if he wished to introduce any records. He declined. His tax returns were prepared and signed by his accountant, but they were not signed by Davenport, nor is there any indication that they were actually filed. These returns are insufficient to satisfy his duty to maintain sufficient records and allow an adequate inquiry into those transactions.

This is not a simple consumer case. This was a sizable business operation generating significant income and owning assets consisting of large, expensive heavy equipment. Davenport spoke of experience with leasing his equipment to other people, knowledge of lease agreements, insurance requirements, brokering sales of equipment. He had numerous financing arrangements with lenders in addition to his First Bank dealings. The Court expects that he would preserve financial records or obtain copies of records he no longer possessed. Even if his records were lost in the manner he described, this is an insufficient excuse and is an attempt to blame others rather than offer a satisfactory explanation and justification for failing to maintain

records. The Court infers that Davenport's failure to maintain and produce meaningful financial records is actually an attempt to obfuscate and prevent any inquiry into his financial dealings by his creditors. The Court finds that his discharge should be denied under this section.

    C.    **§ 727(a)(5): failure to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities.**

The purpose of § 727(a)(5) is to ensure that a debtor provide documentation to trace how assets were depleted so that interested parties do not have to speculate about what happened to a debtor's assets. A discharge may be denied if the debtor fails to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities. A creditor's burden under this section is to prove facts establishing that a loss or shrinkage of assets actually occurred. It does not need to demonstrate any fraudulent intent by the debtor. Once it meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.[9] A debtor must provide some corroboration of his explanation which is sufficient to eliminate speculation.[10] Determining whether an explanation is sufficient is left to the sound discretion of the court.[11] Issues related to health problems or similar ailments are not sufficient to overcome an unsatisfactory explanation regarding the loss of assets.[12]

The Court finds that First Bank presented a prima facie case showing a loss of assets. Davenport did not dispute that he did not possess the assets he pledged as collateral to First Bank when he filed his bankruptcy. The loss of the Case Skid Steer was not contested. Davenport

---

[9] *Stewart*, 263 B.R. at 618..

[10] *See Grassmann v. Brown (In re Brown)*, 570 B.R. 98, 118 (Bankr. W.D. Okla. 2017) (citations omitted.).

[11] *Sears*, 565 B.R. at 192 (citing *Potts*, 501 B.R. at 726, and cases cited therein.)

[12] *Grassmann*, 570 B.R. at 119 (citations omitted).

pledged this item on Loan 3615 in October of 2014, and Davenport's Statement of Financial Affairs indicates that it was stolen from a job site in July of 2015. First Bank's officer Byrd testified that the repossession agents it hired were unable to locate Davenport's collateral. The Court finds Davenport's testimony that this large item was stolen one weekend from the home of Brian Tarter highly suspicious and not credible. Even if the Court believed this explanation, which it does not, Davenport provided no corroborating evidence.

Likewise, Davenport's explanation that the 2011 John Deere bulldozer was sold to an unknown person was not credible. There was no information in his bank records supporting his claim that First Bank authorized this sale. He provided no receipt nor information from which details of this purported sale could be confirmed. There was no evidence that he paid any of the proceeds of this sale to First Bank. Funds advanced to him on Loan 3677 were $100,175 on March 11, 2015. He agreed that he owed $118,411.94 on this loan when he filed bankruptcy. Other than the purchase price, Davenport could not recall any information regarding the sale of this machinery - not the buyer nor the date. The Court finds this lack of detail convenient and not credible. Davenport recalled specific details regarding the purported sale of the 2010 JCB Trac Hoe in 2012, yet he remembered almost nothing about the sale of the John Deere made sometime after March of 2015. He recalled conversations with First Bank's President in detail, but nothing about this sale. He seemed to believe that because he offered to substitute another bulldozer for this collateral, and First Bank had no record of swapping that collateral, it was First Bank's fault rather than his that no collateral was available for this debt. Without any documentation to support his version of events, the Court finds his explanation lacking in credibility and wholly unsatisfactory.

Finally, the Court finds Davenport's explanation regarding the loss of the 2010 JCB Trac Hoe to be incoherent. Davenport's testimony left the Court with more questions rather than providing a satisfactory explanation of the loss of this asset. Davenport repeatedly stated that this collateral was sold in June of 2012, before he pledged it as collateral on Loan 3004 on August 28, 2012. Brian McGahey's email, which Davenport agreed could be admitted into evidence, disputed his story that McGahey brokered the sale of the 2010 Trac Hoe. The "sales receipt," which was a webpage, referred to a 2009 Trac Hoe. Davenport also stated that after he sold the 2010 JCB Trac Hoe in June of 2012, and the sale proceeds were eventually paid to First Bank on August 27, he pledged the same Trac Hoe as collateral on Loan 3004 on August 28, 2012. He had no credible explanation of how he pledged an item he sold two months earlier. His schedules listed a 2009 JCB machine as collateral on Loan 3004. First Bank's records do not reflect the receipt of the $115,000 sale proceeds and application on Davenport's loans. The only corroborating evidence is Davenport's bank statement indicating a deposit of $115,000 in June of 2012. But even if Davenport did receive those funds into his business checking account, there is no record these funds were paid to First Bank, only Davenport's assertion that they were. If Davenport was simply confused about the year of the Trac Hoe he sold, that still does not explain what happened to the other Trac Hoe he pledged as collateral for Loan 3004. The Court cannot nor should not speculate about what actually happened. Davenport admitted that he no longer has the 2010 Trac Hoe and his only explanation is that First Bank took his $115,000 and never credited it against his debts. The Court finds this explanation completely lacking in credibility, raises more questions than answers, and is wholly unsatisfactory.

Davenport agreed that his business generated a significant amount of income and that he had assets and resources to sufficiently collateralize the loans he had with First Bank. His

explanation of how those assets were dissipated and lost was insufficient. The Court therefore concludes that Davenport has failed to meet his duty under § 727(a)(5) and has failed to satisfactorily explain the loss of the 2011 John Deere bulldozer, the 2013 Case Skid Steer and the 2010 JCB Trac Hoe. His discharge should be denied.

### IV. Conclusion

For the above and foregoing reasons, the Court finds that Justin Davenport's discharge should be denied. A separate judgment denying discharge shall be entered in this case.

###